IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO. 7:17-cv-44

MELISSA GORE,

Plaintiff,

v.

WAL-MART STORES, INC., XYZ
CORPORATION, INC., and,
JOHN DOE,

Defendants.

**EXHIBIT B**

**DEFENDANT'S MEMORANDUM OF
LAW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Exhibit B – Excerpts from Plaintiff's Deposition (deposed on 8 November 2017)

school, the local high school there in Mullins next to AVM is where I took my classes.

Q. Okay. Before this incident took place at the Wal-Mart store in Whiteville, had you ever fallen down in a public place where you felt it was necessary to report the event to the owner of the property?

A. No, sir.

Q. Have you ever sustained any injury on somebody else's property?

A. No, sir.

Q. What parts of your body do you allege to have injured in this accident?

A. My knees.

Q. Both of them or one more than the other?

A. Both. Well, my right more than my left, and then I had bruising on my wrist where my hands hit the floor, and then I had pulled a muscle in my back.

Q. After the incident took place, was surgery performed on your right knee?

A. Yes, sir.

Q. After the incident took place, was any surgery performed on your left knee?

A. No, sir.

Q. We'll talk more about that later.

Before the incident took place at the Wal-Mart

store, had you had any medical problems with your right knee?

A.    No, sir.

Q.    Before the incident took place at the Wal-Mart store, had you had any medical problems with your left knee?

A.    No, sir.

Q.    Before the incident took place at the Wal-Mart store, had you had any medical problems with your wrist?

A.    No, sir.

Q.    Before the incident took place in the Wal-Mart store, had you had any medical problems with your back?

A.    No, sir.

Q.    In the three years before the accident took place at the Wal-Mart store, had you treated with any doctors at all for any conditions related to either knee, your wrist, or your back?

A.    No, sir.

Q.    How about ever?

A.    I've had like, you know, little muscle spasms maybe in my back from working, but nothing medically treated.

Q.    Okay.  If you don't mind, I'm going to take a personal break.

A.    Okay.

Q.    Can we go off the record just for a second?

(Off the record from 12:06 p.m. to 12:11 p.m.)

BY MR. WASHBURN:

Q. Ms. Gore, we took -- thank you for allowing me to take a break. We're back on the record under the same terms and conditions that I described to you earlier. Do you understand that?

A. Yes, sir.

Q. All right. Now, at the time of the accident, you were actually living in South Carolina; is that correct?

A. Yes, sir.

Q. What were you doing up in the Whiteville area on the day of the accident?

A. We were going to Lake Waccamaw for the weekend with family.

Q. Okay. Do you remember about what day of the week it was?

A. It was a Friday.

Q. Okay. Were you just pulling into town, or had you been in town for a little bit?

A. Just got there.

Q. Okay. Do you often come up to the Lake Waccamaw area?

A. At that time, no, but, since then, we -- we do.

Q. Okay. Do you own a house or do you rent a

Case 7:17-cv-00044-FL    Document 15-2    Filed 11/30/17    Page 4 of 12

vacation house from time to time?

A. Family rents.

Q. Okay. Was this the first time you all had stayed at Lake Waccamaw?

A. No, we'd stayed a couple times.

Q. Okay. Had you ever been to that Wal-Mart store before?

A. About once or twice, but never over in the grocery area.

Q. Prior to the day the incident took place, had you formed any opinions about whether it was a well-kept store or whether it was messy?

A. No, sir. It was just a regular Wal-Mart.

Q. Did you know anybody who worked there?

A. No, I do not.

Q. Is your husband from the Whiteville, North Carolina, area?

A. No, sir.

Q. Did he have any more experience with the area than the two of you as a couple did just from vacations?

A. No, sir.

Q. Does that question make sense?

A. Yes, sir.

Q. In other words, whatever -- whenever you would -- the times you came up, he came up with you?

A.    Yes, sir.

Q.    Okay.  Do you know if he, by any chance, knew anybody who worked at that Wal-Mart?

A.    No, sir, he doesn't.

Q.    Had you just driven into town from South Carolina when you went to that Wal-Mart store?

A.    Yes, sir.

Q.    Was that the first stop you made when you got to the Whiteville area?

A.    Yes, sir.

Q.    All right.  Who was with you?

A.    My husband, Robert.

Q.    Any children?

A.    No, sir.

Q.    Was it a car that you all own?

A.    Yes, sir.

Q.    Okay.  And who was driving?

A.    He -- Robert.

Q.    At that time, did your car, by any chance, have a handicap parking sticker on it?

A.    No, sir.

Q.    Has your husband ever been involved in personal injury litigation, to your knowledge?

A.    No, sir.

Q.    Has he ever fallen down in a public place where he

was injured?

A. No, sir.

Q. Okay. Well, tell me how the accident happened.

A. We were shopping.

Q. Well, let's back up a little bit and take it step by step.

A. Okay.

Q. And I'll lead you through it a little bit and then I'll turn you loose for a free-flowing description, okay?

A. Okay.

Q. Did you -- and let me preface my next question by saying this, most Wal-Mart stores with which I'm familiar have more than one front entrance. They have an entrance on the right-hand side, which is sometimes groceries, sometimes general merchandise, another entrance on the front, and on one side or the other they'll have lawn and garden. Are you with me so far?

A. Yes, sir.

Q. This Wal-Mart store, if you were looking at it from the parking lot, do you remember which entrance you went in?

A. It was the health and beauty entrance, not the lawn and garden, but not the grocery. It was the one in the middle, the --

Q. Okay. So if you are standing in the middle of the

Electronically signed by JENNIFER RAY (001-064-082-8705)

structure, it would have been the one over to the left-hand side?

A. No, it would have been the kind of -- the one in the middle.

Q. The one in the middle?

A. Yeah.

Q. Okay. But you remember it was health and beauty?

A. Well, that's -- yeah.

Q. Was there a pharmacist near there, pharmacy near there?

A. I think so, yeah.

Q. Over to the right-hand side --

A. To the right. Uh-huh (yes).

Q. -- if memory serves?

A. Yes, sir.

Q. Okay. So tell me what happened after you all got into the store.

A. We went in. We went just shopping, getting some stuff for the weekend, went through looking at some bathing suits. He had to get a battery for the boat. We went around through there looking, just made a round through the store just picking up this and that. I had to go through, get some groceries. Hadn't been in that area of the store before.

Q. What area of the store?

Electronically signed by JENNIFER RAY (001-064-082-8705)          94aa21c5-55de-4e4f-a53e-0c517bcdc254

A. The grocery area.

Q. You mean hadn't been to the grocery section yet?

A. Yet, right.

Q. Okay. Hadn't been to the grocery section yet. Okay.

A. Yes, sir. So we were just going through picking up what we needed. We were coming down the middle aisle of the grocery section and the clothing section, that aisle through there.

Q. Was the clothing on your right-hand side or the left-hand side?

A. On my left.

Q. Clothing was on your left-hand side --

A. Uh-huh (yes).

Q. -- as you were going towards the front of the store?

A. We were going towards the front.

Q. And the clothing was on the left?

A. I think so. Yes, sir.

Q. And grocery was on the right?

A. Uh-huh (yes).

Q. Okay. All right. I'm with you.

A. Because we -- anyway, we had come out and in some aisles, and then we were going towards the front. I spotted the ice cream aisle, so I told him, I said, "Let me get me

some ice cream." So I took a right, went down the aisle. He kept on going. So I got my ice cream and I come back out, and when I rounded the corner -- I was looking for him. You know, I was looking around seeing which way he went, and then I noticed him over to my right. So I turned the corner and my feet came out from under me.

Q. Now, when you went down the ice cream aisle, did you get the ice cream, then make a U-turn and come right back the same way you came?

A. Yes, sir.

Q. And then you came back to the main aisle that was going towards the front of the store?

A. Yes, sir.

Q. And was it in this main aisle where the accident happened?

A. It was right in -- once I turned on the main aisle and went to take my right down the next aisle, that's -- it was right there.

Q. Was this a scenario where there -- well, let me back up a little bit.

Do you know what caused you to fall?

A. After I got up, I noticed there was squished grapes on the floor.

Q. Okay. Do you know how they got there?

A. I do not.

Q. Do you know how long they had been there?

A. I do not.

Q. Did anybody who worked for Wal-Mart say how they got there?

A. No, sir.

Q. Did anybody who worked for Wal-Mart say how long they had been there?

A. No, sir.

Q. Are you aware of any evidence that suggests how long the grapes had been present?

A. No, sir, other than there was some more that were smushed over to the side from where I had -- had fallen.

Q. Okay. Had they been smushed by you?

A. No, sir.

Q. How do you know that?

A. I weren't over where they were. Where I fell was other smushed grapes.

Q. Okay. A total of how many grapes did you see?

A. Probably the most in the whole area there was probably about five or six at the most. Right there where I was at was probably about three, maybe four.

Q. Were there any grapes stocked in that area?

A. I'm not real sure. At that point, I had never been in that area. It was the beginning of the produce aisle. So --

Electronically signed by JENNIFER RAY (001-064-082-8705)

Q.   The produce aisle or the produce area?

A.   Well, the area.

Q.   Okay.  Did you -- did you look around to see if there were any grapes stocked above the floor in the area where you fell?

A.   I did not at that time, no, sir.

Q.   Did anybody see you fall?

A.   There was an Asian lady there in front of me, and my husband was down further.  He didn't actually see me fall.  He heard me fall and turned to look.  She saw -- she said she saw me fall.

Q.   Did she work for Wal-Mart?

A.   No, sir.

Q.   Did you get her name?

A.   I did not.

Q.   Do you know if she filled out a witness statement?

A.   I do not.  By the time we got someone over there, the manager, that night manager, whatever, there, I didn't see her anymore.

Q.   Okay.  What happened next?

A.   Well, when I fell, my husband come running back, had to help me up.  I had to sit there for -- for a few minutes.  And he helped me up and I just -- you know, he -- I grabbed onto the buggy, and he went to try to find some help.  I was hurting so I just stood there because I didn't

Electronically signed by JENNIFER RAY (001-064-082-8705)